UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


UNITED STATES OF AMERICA,

                      Plaintiff,            CR 03-432-HA

      v.

                                          OPINION AND ORDER

J. KENNETH STRINGER, *et al.*,

                      Defendants.

HAGGERTY, Chief Judge:

     On September 23, 2004, the grand jury issued a Third Superseding Indictment (hereinafter referred to as the Indictment) charging defendants J. Kenneth Stringer (Stringer), J. Mark Samper (Samper), and William N. Martin (Martin) with fifty counts of conspiracy and securities fraud. Defendants are former executives of FLIR Systems, Inc. (FLIR). The

Indictment alleges that defendants acted in concert to inflate FLIR's revenues through a series of fraudulent revenue recognition and accounting practices in an attempt to defraud FLIR, its Board of Directors, its shareholders, its auditors, and the United States Securities and Exchange Commission (SEC).

Defendants filed separate Motions to Dismiss the Indictment, or in the Alternative, Suppress Testimony (Docs. #166, 182, 188). The court held eleven days of evidentiary hearings. Oral arguments were heard on November 15-16, 2005. The court rules on each motion in turn below.

**<u>Defendant Stringer and Martin's Motions to Dismiss/Suppress</u>**

Defendants Stringer and Martin seek to dismiss the Indictment, or, in the alternative, suppress the statements they made to the SEC because the information was produced in violation of their Fourth and Fifth Amendment rights. Specifically, defendants assert that had they been notified of the possibility of the criminal prosecution, they would have sought a stay of the civil proceedings, would not have produced any documents and Martin would not have provided a Wells Submission. Defendants seek dismissal of the Indictment or, alternatively, suppression of their statements made to the SEC in the prosecution's case-in-chief and for impeachment and rebuttal evidence, suppression of all documents provided to the SEC, vacation of the civil judgment entered into by Martin, invalidation of the consent decree, and suppression of Martin's Wells Submission.

The SEC began its investigation of defendants in mid-2000. Shortly thereafter, Assistant United States Attorney Charles Gorder (Gorder) met with Diana Tani, an officer with the SEC, and later requested access to the SEC's investigative files of defendants. Gorder indicated that

he was making the request pursuant to ongoing investigation of defendants by the United States Attorney Office's (USAO) and the Federal Bureau of Investigation's (FBI). Gorder also indicated that defendants were the subjects of a Department of Justice investigation.

In August 2000 the SEC met with Assistant United States Attorney Kent Robinson (Robinson) for a preliminary discussion regarding the investigation of defendants. In October 2000 the SEC, the FBI and Robinson met again for an extensive discussion of the case. The SEC provided the USAO and the FBI with five notebooks of documents and a detailed memorandum setting forth the SEC's legal and factual analyses. At this meeting it was decided that the criminal investigation would abate in order to continue receiving statements from defendants and other witnesses through the civil investigation. In a memorandum memorializing the meeting, FBI Agent Boyer wrote:

> It was determined that since Stringer has agreed to be interviewed by the SEC, the FBI will make no effort to interview Stringer or other corporate officers at this time so as not to jeopardize the opportunity to obtain statements from these individuals.

Stringer Ex. 59, Letter from Agent Boyer, FBI, to Kristine Olson, SEC, at 2 (October 20, 2000).

Ten days after meeting with the SEC and FBI, Robinson requested funding for a computer system for the FLIR investigation and stated that absent a "persuasive and complete explanation" the case "warrants prosecution." Stringer Ex. 101, Memorandum from Kent Robinson, to Judy Kobbervig, *et. al.*, USAO, at 2 (October 13, 2000). Robinson noted that the USAO would "benefit greatly" from the SEC's investigation and stated that the "probability of prosecution is very high." *Id.*. Robinson also identified Martin, Stringer and Samper as potential targets. Stringer Ex. 100, Handwritten Notes of Kent Robinson, at 3 (October 3, 2000).

In January 2001 the SEC investigators visited the FLIR facilities. Following the visit, the SEC, FBI and USAO met to discuss the progress of the investigation. In that meeting it was decided that the criminal investigators would continue to allow the civil investigators to handle the investigation. In a memorandum memorializing the meeting, FBI Agent Boyer stated that "AUSA Robinson advised that based on the level of cooperation that the new FLIR management team has extended to the SEC, no overt investigation will be conducted by the FBI at this time." Stringer Ex. 62, Memorandum from Agent Boyer, FBI, to Gordon Compton, FBI, at 3 (February 5, 2001).

The USAO continued to rely on the work product generated by the SEC investigators. Robinson explained that FLIR was cooperating and so "a decision was made not to pursue a parallel grand jury investigation" but to "passively observe[] the results of the SEC's work." Stringer Ex. 101, Memorandum from Robinson to Judy Kobbervig, *et. al.*, at 1 (April 4, 2001). Robinson noted this strategy had "provided good investigative results, at little cost to us" and that the "SEC's investigation continues to suggest that this case will produce a criminal prosecution." *Id.* Robinson also reiterated that the investigation continued to implicate Stringer and Samper. *Id.*

The civil and criminal investigators communicated regularly throughout the civil investigation, exchanging information and discussing strategy. Robinson advised the SEC that he was interested in false testimony cases and explained how to create the best record possible for such cases. Stringer Ex. 66, E-mail from Lorraine Echavarria, SEC, to Diana Tani, *et. al.*, SEC, at 1 (April 5, 2001). The SEC forwarded this information to "all testimony takers so that we will know and understand what Kent needs/wants to prosecute a false testimony case." *Id.*

The SEC also agreed to conduct certain interviews in Oregon to provide potential jurisdiction for the Oregon USAO, despite the inconvenience to the SEC investigation.

Robinson identified to the SEC that Samper and Stringer were targets. *Id*. The SEC expressed a desire to "convince him to expand" targets beyond Samper and Stringer. *Id.* A few months later the USAO and FBI traveled to Los Angeles to meet with the SEC and maintained that Samper, Stringer, Martin and two others were targets of the investigation. Stringer Ex. 71, Memorandum from Agent Compton, FBI, to Agent Boyer, FBI, at 2 (July 5, 2001).

In June 2001 SEC attorney Lorraine Echavarria (Echavarria) and Assistant United States Attorney Allan Garten (Garten) discussed the criminal investigation and decided to wait before commencing parallel proceedings, noting that with such proceedings the SEC action would be stayed and that defendants and FLIR would most likely settle unless the USAO was involved. Stringer Ex. 69, Handwritten Notes of Echavarria, at 3 (June 6, 2001) (hereinafter Stringer Ex. 69). In December 2001, the SEC and USAO decided it was still "premature to surface," and that the presence of the USAO would "impede" a scheduled meeting with FLIR. Stringer Ex. 75, Handwritten Notes of Diana Tani, at 1 (December 19, 2001).

The civil investigators were aware of the need to suppress the presence of the USAO. Echavarria noted to "make sure court reporters won't tell [FLIR's attorney] about Kent." Stringer Ex. 60, Handwritten Note of Echavarria. Echavarria also wrote to Assistant United States Attorney Allan Garten (Garten), requesting he stay away from SEC interviews because FLIR's attorney would be present and noting "[i]f you plan to surface to company [FLIR] counsel soon, that is a decision we would like to discuss with you prior to you making it." Stringer Ex. 70, E-mail from Echavarria, SEC, to Garten, USAO, at 1 (July 3, 2001). Echavarria and Garten

Page 5 -- Opinion and Order

discussed the strategy for the case and decided that the USAO would "surface end of Jan/early Feb [2003]" and with "no notice." Stringer Ex. 94, Handwritten Note of Echavarria (December 20, 2002).

Defendants were subpoenaed to testify before the SEC and were informed that disclosure of information to the SEC is mandatory, subject to the valid assertion of any legal right or privilege. The subpoenas also stated that failure to provide information could result in a court order compelling such information followed by criminal sanctions. Defendants were given the standard SEC Form 1622, which is given to all testifying witnesses. This form informs witnesses of their right to counsel, their Fifth Amendment rights, and the routine uses of information. The "routine uses" listed included a proviso that the SEC often makes its files available to other governmental agencies, particularly the USAO. Form 1662 also noted that any information given to the SEC may be used in any federal criminal proceeding.

Defendants assert that their due process rights were violated because they were not advised that the prosecutor and the FBI were using the SEC to gather evidence for a criminal prosecution. They argue that this prejudiced them because their Fifth Amendment right not to be compelled to testify was removed; they lost the opportunity to seek immunity from, or to cooperate with the prosecution; they were unable to seek a stay of the proceedings; the prosecutor and the FBI were granted more discovery than they would have been entitled to under the Federal Rules of Criminal Procedure; and Martin provided to the prosecution through the Wells Submission any and all defenses he may have had to the subsequent criminal charges.

Stringer testified before the SEC on October 29, 2001. He asserts that neither he, nor his attorney, was aware that the prosecution was contemplating criminal charges against him. In a

dialogue with Echavarria, Stringer's attorney asked the following questions and received the following responses:

> STRINGER'S ATTORNEY: My first question is whether Mr. Stringer is the target of any aspect of the investigation being conducted by the SEC.
>
> ECHAVARRIA: The SEC does not have targets in this investigation.
>
> STRINGER'S ATTORNEY: The other questions I have relate to whether or not, in connection with your investigation, the SEC is working in conjunction with any other department of the United States, such as the U.S. Attorney's Office in any jurisdiction, or the Department of Justice.
>
> ECHAVARRIA: As laid out in the 1662 form, in the "routine use of" section there are routine uses of our investigation, and it is the agency's policy not to respond to questions like that, but instead, to direct you to the other agencies you mentioned.
>
> STRINGER'S ATTORNEY: And which U.S. Attorney's office might I inquire into?
>
> ECHAVARRIA: That would be a matter up to your discretion.

Defendant Stringer's Memorandum in Support of Motion to Dismiss, Ex. 8.

Defendants argue that the SEC and USAO worked together on a single investigation, with the USAO hiding behind the SEC to sidestep defendants' constitutional rights that they would have otherwise asserted in the criminal proceeding, and build up its criminal case against them.

The prosecution argues that the USAO and the SEC were conducting parallel proceedings, which is an acceptable approach for civil and criminal authorities investigating the same matter. *See United States v. Kordel*, 397 U.S. 1, 11 (1970); *Securities and Exchange Comm'n v. Dresser Indust.*, 628 F.2d 1368 (D.C. Cir. 1980). The prosecution also argues that

Page 7 -- Opinion and Order

defendants were provided with adequate notice that their statements could be used in a criminal prosecution through Form 1662.

The court concludes that these were not parallel investigations. The USAO identified potential criminal liability and a few targets in the beginning of the investigation, and elected to gather information through the SEC instead of conducting its own investigation. The government was concerned that the presence of a criminal investigation would halt the successful discovery by the SEC, witnesses would be less cooperative and more likely to invoke their constitutional rights, and that the rules of criminal discovery would be invoked. Stringer Ex. 69, at 3 (June 6, 2001) (memorializing a telephone conversation between Echavarria and Garten wherein Garten explains that once there is an indictment "discovery is over. Criminal is totally 1 sided" and that he would then give everything and get nothing). The government was aware that there was no parallel proceeding. *See* Stringer Ex. 78, Draft E-mail from Diana Tani to Laurie Stegman (noting that Garten wanted to see what the SEC put together "rather than running his own parallel criminal investigation"); Stringer Ex. 101, Memorandum from Robinson to Judy Kobbervig, *et. al.*, at 1 (April 4, 2001) (stating that a decision was made "not to pursue a parallel grand jury investigation").

The delay by the USAO was not for the purpose of reviewing evidence gathered by the SEC to make an informed decision as to whether the case warranted prosecution. From the beginning, the USAO consistently held the position that a criminal prosecution was likely. Almost a year after the SEC investigation began and two years before the USAO made its presence known, the USAO reiterated its position that the case would most likely warrant criminal prosecution, yet decided not to conduct a parallel criminal investigation. Stringer Ex.

101, Memorandum from Robinson to Judy Kobbervig, *et. al.*, at 1 (April 4, 2001). Moreover, the USAO was actively involved in the SEC investigation: meeting regularly, receiving documents, requesting interviews be conducted in Oregon to establish jurisdiction, advising what information was needed for a successful criminal prosecution, specifically instructing on how best to conduct interviews to gather evidence for false statement cases, intentionally hiding its presence from FLIR's attorneys, and repeatedly planning with the SEC as to when it would be best to surface and conduct an overt criminal investigation.

The strategy to conceal the criminal investigation from defendants was an abuse of the investigative process. In *Kordel*, the Court found there was no abuse in using the civil discovery process to obtain evidence later used in a criminal proceeding because the case was not one in which the government "failed to advise the defendant in its civil proceeding that it contemplates his criminal prosecution . . . nor with any other special circumstances that might suggest the unconstitutionality or even the impropriety of this criminal prosecution." This case clearly falls within the scenario contemplated by the Supreme Court as a "violation of due process or a departure from proper standards in the administration of justice." *Kordel*, 397 U.S. at 11. In this case, the government did not advise defendants that it anticipated their criminal prosecution. Moreover, the USAO intentionally shielded its intentions behind the guise of a civil prosecution, resorting to subterfuge to maintain the secrecy of its involvement.

Defendants had been identified consistently as "targets" or "subjects," and yet the government failed to alert them to the possibility of criminal exposure beyond presenting the standard form that is given to every individual, whether or not a target, prior to testifying. In light of the active role of the USAO in the SEC investigation, this warning was insufficient. *See,*

*e.g., United States v. Thayer*, 214 F. Supp. 929, 933 (D. Colo. 1963) (noting that "the giving of the warning can not have much significance where the defendant was, so to speak, then within the sights of the Government and did not receive an explanation of the true import of the [] inquiry").

In addition, it is a due process violation if government agents make affirmative misrepresentations as to the nature or existence of parallel proceedings or otherwise use trickery or deceit. *United States v. Robson*, 477 F.2d 13, 18 (9th Cir. 1973). Echavarria's response to the direct inquiry by Stringer's attorney as to the existence of a criminal investigation was evasive and misleading, particularly in light of the close association between the USAO and the SEC throughout the investigation and the early identification of Stringer as a criminal target.

A government agency may not develop a criminal investigation under the auspices of a civil investigation. *United States v. Grunewald*, 987 F.2d 531, 534 (8th Cir. 1993). It would be a "flagrant disregard of individuals' rights" to "deliberately deceive, or even lull" someone into incriminating themselves in the civil context when "activities of an obvious criminal nature are under investigation." *Id*. (referencing a civil tax audit versus a criminal tax investigation). Here, defendants were identified as subjects of a criminal investigation. The government's tactic to move forward under the guise of a civil investigation, violated defendants' due process rights. *Robson*, 477 F.2d at 18 (finding that the government can not "affirmatively mislead the taxpayer into believing that the investigation is exclusively civil in nature and will not lead to criminal charges"). The USAO confirmed its commitment to a criminal case, but emphasized to the SEC that it would "need to be spoonfed" the evidence from the civil investigation. Stringer Ex. 73, E-mail from Garten, USAO to Echavarria, SEC (November 6, 2001).

Page 10 -- Opinion and Order

Assuming, *arguendo*, that these were parallel proceedings, dismissal of the indictment or suppression of voluntary testimony given in a parallel civil proceeding is warranted if the government engaged in deceit, trickery, or intentional misrepresentation. *United States v. Tweel*, 550 F.2d 297, 300 (5th Cir. 1977). Here, the government engaged in deceit and trickery to keep the criminal investigation concealed. The government went so far as to instruct court reporters to refrain from mentioning the U.S. Attorney's involvement and to have Garten avoid being near certain interviews for fear his presence would cause the criminal investigation to surface. Moreover, Echavarria misled Stringer and his attorney into believing he was not a target and evaded the question about the USAO's involvement.

Dismissal of an indictment is warranted if the alleged governmental misconduct is "so grossly shocking and so outrageous as to violate the universal sense of justice." *United States v. Smith*, 924 F.2d 889, 897 (9th Cir. 1991); *United States v. Ramirez*, 710 F.2d 535, 539 (9th Cir. 1983). The conduct involved in this case meets that standard. The USAO spent years hiding behind the civil investigation to obtain evidence, avoid criminal discovery rules, and avoid constitutional protections. In *United States v. Rand*, the court dismissed the indictment, finding that the government had "engaged in an obnoxious form of using parallel proceedings." 308 F.Supp. 1231, 1234 (N.D. Ohio 1970). The government "may not bring a parallel civil proceeding and avail itself of the civil discovery devices to obtain evidence for subsequent criminal prosecution." *United States v. Parrott*, 248 F.Supp. 196, 202 (D.D.C. 1965). The facts in this case are more egregious, as it cannot credibly be claimed that these were parallel proceedings.

Moreover, defendants Fifth Amendment rights were violated. As defendants were unaware of the involvement of the USAO, it is "unrealistic to suppose that defendant[s] [would] be on guard against incriminating [themselves]." *Rand*, 308 F.Supp. at 1237. As such, "it is unfair in the extreme to penalize defendant[s] for failure to invoke [their] privilege against self-incrimination. *Id.*

In view of these findings, to "simply suppress the evidence which the government obtained by the methods explored above would not be sufficient to remedy the violation of defendant[s] constitutional rights." *Id.* at 1238. Accordingly, the indictments are dismissed.

Defendants' statements to the SEC were gathered in violation of defendants' due process and Fifth Amendment rights. *Kordel*, 397 U.S. at 12; *Robson*, 477 F.2d at 18. In the event the Ninth Circuit Court of Appeals determines that dismissal of the indictment is in error, for the foregoing reasons, the statements and the evidence obtained from those statements are suppressed.

**Defendant Samper's Motion to Dismiss/Suppress**

Samper seeks dismissal of the Indictment for violations of his Fifth Amendment Due Process rights, or, alternatively, suppression of all evidence obtained as a result of the violation. Samper joins in the arguments of Martin and Stringer discussed above, and also raises the claim that the government took unfair advantage of Stoel Rives' conflict of interest while pressing for a criminal prosecution.

Samper, former Chief Financial Officer of FLIR, tendered his resignation in February 2000 in the midst of FLIR's public announcements of accounting errors and fallen earnings. Shortly thereafter, the SEC began investigating FLIR and several employees, including Samper.

Page 12 -- Opinion and Order

In March 2000, Lois Rosenbaum (Rosenbaum) of Stoel Rives offered to undertake joint representation of Samper, Stringer, and FLIR. Samper indicated that he had already retained independent counsel, but on May 15, 2000, Samper consented to joint representation. On June 30, 2000, Samper was subpoenaed to testify before the SEC.

In July 2000, Echavarria wrote a letter to Rosenbaum, indicating that she was concerned that Stoel Rives was still representing FLIR and several FLIR employees, including Samper:

> Although it is far too early in the investigation of the SEC staff to identify people who may possess liability, we are troubled by the scope of [Stoel Rives'] representation. We urge you to stringently evaluate and assess your conflicts prior to continuing with this method of representation. Further, we hope that the possibility of conflicts has been sufficiently explained to all of your putative clients.

Government's Opposition to Defendant Samper's Motion to Dismiss (Govt.'s Opp. to Def. Samper's Mot. to Dismiss), Ex. 20. Rosenbaum responded that she was aware of her ethical obligations and would act accordingly.

Upon advice of Stoel Rives counsel to fully cooperate with the government to avoid liability, Samper testified before the SEC on October 19, 26, and 27, 2000, and later disclosed all FLIR documents in his possession. A second round of interviews was conducted in October and November 2001. At the hearings, Samper was provided the standard SEC Form 1662, which outlined the rights of witnesses and the "routine uses" that the SEC makes of information provided.

The SEC also interviewed several other FLIR employees, many of whom were represented by Stoel Rives and provided either directly incriminating testimony against Samper or provided testimony contrary to Samper's.

On March 8, 2002, FLIR submitted a Wells Submission and stated that civil enforcement proceedings were unnecessary because FLIR had terminated Samper, one of the key employees who had brought FLIR into the financial quandary: "FLIR does not contest that significant accounting errors were made in the 1998 and 1999 fiscal years. However, the problems that existed in those years are the problem of a company that no longer exists. . . . The individuals who were responsible for the accounting errors have been terminated, and the Company is under new executive and financial management." Defendant Samper's Memorandum in Support of Motion to Dismiss (Def. Samper's Mem. in Supp. of Mot. to Dismiss), Ex. 36, at 1, 6. Shortly thereafter, FLIR entered into a settlement agreement with the SEC wherein they agreed to not violate securities laws in the future. The SEC filed its Complaint against Samper in September 2002.

Samper claims that during the course of negotiating a settlement with the SEC, he asked Echavarria whether a criminal prosecution would follow. Samper asserts that Echavarria misled Samper and deliberately concealed from him the fact that the USAO had already accepted SEC's referral of a criminal prosecution and was actively involved in the investigation.

In January 2003, the prosecutor met with Rosenbaum, wherein she assured the prosecutor that FLIR intended to cooperate in the criminal investigation. *Id.*, Ex. 41. On March 5, 2003, Ms. Rosenbaum sent Samper a letter stating that the Department of Justice had informed her that it was investigating Samper and other FLIR employees. *Id.*, Ex. 42. She indicated that Stoel Rives would continue to act as FLIR's counsel, with Samper's permission, but would no longer represent individuals, including Samper. *Id.* On April 11, 2003, Samper agreed to have Stoel Rives continue as FLIR's counsel, with the proviso that Stoel Rives would not disclose Samper's

Page 14 -- Opinion and Order

"secrets and confidences [or] affirmatively assist the DOJ in developing its case." Def. Samper's Mem. in Supp. of Mot. to Dismiss, Ex. 43. Samper argues that Stoel Rives, through Ms. Rosenbaum, continued to represent FLIR and several FLIR employees who continued to provide useful information to the SEC and the prosecutor in the corresponding civil and criminal proceedings. Def. Samper's Mem. in Supp. of Mot. to Dismiss, Ex. 44.

Samper argues that, as a result, the SEC and the prosecutor continued to exploit what they knew to be a blatant conflict of interest in having Samper's former attorney assist the prosecution in building its criminal case against him. Specifically, Samper argues that the government interfered with Samper's relationship with Rosenbaum by: exploiting Stoel Rives' conflict of interest in representing both FLIR and Samper; failing to advise Samper of facts that would have revealed the conflict of interest; failing to obtain a court order removing Stoel Rives as Samper's counsel; misleading Samper as to whether a criminal investigation had been initiated; using Stoel Rives to gather incriminating evidence against Samper; and depriving Samper of zealous representation and conflict-free advice.

Government interference with a defendant's relationship with his attorney may render the counsel's assistance so ineffective as to violate the defendant's Fifth Amendment right to due process of law. *United States v. Irwin*, 612 F.2d 1182, 1185 (9th Cir. 1980). However, not all government action that could arguably be called an interference is unlawful. *Id.* "[T]he right is only violated when the intrusion substantially prejudices the defendant," such as using evidence gained through the interference against the defendant at trial, using confidential information pertaining to the defense plans and strategy, causing the defendant to lose confidence in his or her attorney, and other actions intended to give the prosecution an unfair advantage at trial. *Id.*

at 1187 (referencing the Sixth Amendment right to counsel, which differs from the Fifth Amendment in that it is triggered once an indictment is issued). When an apparent conflict of interest between the defendant and defense counsel comes to the attention of the government, the government is under an obligation to bring the issue to the trial court's attention and, if necessary, move for disqualification of counsel. *United States v. Tatum*, 943 F.2d 370, 379-80 (4th Cir. 1991).

As discussed above, the SEC was aware that a criminal prosecution would most likely occur, and was actively involved in obtaining evidence for the purposes of criminal prosecution. The government was the only party involved who knew the degree of the conflict of interest in having Rosenbaum represent Samper, FLIR and the other witnesses. Rosenbaum and Samper were not aware of the involvement of the USAO and the intended criminal prosecution. Under these circumstances, the government should have moved for disqualification of counsel. *Id.*; *Securities Exchange Comm'n v. Higashi*, 359 F.2d 550, 553 (9th Cir. 1966) (noting that multiple representation is allowed only when there is no conflict of interest); *Kentucky West Virginia Gas Co. v. Pennsylvania P.U.C.* 837 F.2d 600, 618 (3rd Cir. 1988) (discussing *Higashi* and finding that ordering parties to retain separate counsel when there is a conflict of interest does not violate due process or the Administrative Procedures Act).

In this case, the government took advantage of counsel's conflict of interest and obtained information it might not have otherwise received. After the SEC filed its Complaint, Rosenbaum telephoned the SEC and expressed surprise that the Swedish drop shipment was not identified as a fraudulent transaction. Samper had described the transaction to Rosenbaum, and Rosenbaum, in turn, identified the transaction and provided the supporting documents to the SEC. This

charge was then included in the Indictment.  Rosenbaum's desire to cooperate with the government on behalf of FLIR resulted in additional charges against her other client, Samper. The evidence relating to the Swedish drop shipment was improperly obtained by the government.  *Irwin*, 612 F.2d at 1187.

For the reasons discussed above in the Stringer and Martin motions, the egregious behavior of the government warrants dismissal of the indictment against Samper.  In the event the Ninth Circuit Court of Appeals finds dismissal of the indictment to be in error, suppression of the SEC statements and the evidence obtained from those statements is warranted. Additionally, in light of the particularized harm to Samper by the government's improper behavior regarding Rosenbaum's conflict of interest, the evidence relating to the Swedish drop shipment and anything derived from that evidence is also suppressed.  Charges related to the Swedish drop shipment are also stricken from the Indictment.

## **CONCLUSION**

Defendant Stringer's Motion to Dismiss the Indictment (Doc. #182-1) is GRANTED. Defendant Stringer's Motion to Suppress SEC Interview Statements (Doc. #182-2) is GRANTED.  Defendant Stringer's SEC interview statements and any evidence derived from those statements are suppressed.  Defendant Martin's Motion to Dismiss the Indictment (Doc. #166-1) is GRANTED.  Defendant Martin's Motion to Suppress Statements and Documents (Doc #166-2) is GRANTED.  Defendant Martin's SEC interview statements and any evidence derived from those statements are suppressed.  Defendant Samper's Motion to Dismiss the Indictment for Violation of Due Process (Doc. #188-1) is GRANTED.  Defendant Samper's Motion to Suppress Evidence (Doc. #188-2) is GRANTED.  Defendant Samper's SEC interview

statements and any evidence derived from those statements are suppressed.  Additionally, the evidence related to the Swedish drop shipment is suppressed and any reference to the Swedish drop shipment in the Indictment is hereby STRICKEN.

IT IS SO ORDERED.

Dated this  9   day of January, 2006.

                                          /s/Ancer L.Haggerty
                                             Ancer L. Haggerty
                                      United States District Judge